UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**WESLEY J. RICHARDSON**,

                 Plaintiff,

    v.

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security**,

             Defendant.

Case No. 6:15-cv-00428-KI

OPINION AND ORDER

Kathryn Tassinari
Robert A. Baron
Harder, Wells, Baron & Manning, P.C.
474 Willamette, Ste. 200
Eugene, OR 97401

      Attorneys for Plaintiff

Billy J. Williams
United States Attorney
District of Oregon

Page 1 - OPINION AND ORDER

Janice E. Hebert
Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, OR 97204-2902

John C. Lamont
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

      Attorneys for Defendant

KING, Judge:

Plaintiff Wesley J. Richardson brings this action pursuant to section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and

supplemental security income benefits ("SSI").  I affirm the decision of the Commissioner.

## BACKGROUND

Richardson filed an application for DIB on May 16, 2011, alleging disability as of

January 1, 2009, and an application for SSI with a protective filing date of April 12, 2011.  The

applications were denied initially and upon reconsideration.  After a timely request for a hearing,

Richardson, represented by counsel, appeared and testified before an Administrative Law Judge

("ALJ") on August 9, 2013.

On October 8, 2013, the ALJ issued a decision finding Richardson not disabled within the

meaning of the Act and therefore not entitled to benefits.  This decision became the final decision

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on

January 9, 2015.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits

to people who have contributed to the Social Security program and who suffer from a physical or

mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security

income benefits may be available to individuals who are age 65 or over, blind, or disabled, but

who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to

cause death or to last for a continuous period of at least twelve months.  42 U.S.C.

§§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his

physical or mental impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for

determining if a person is eligible for either DIB or SSI due to disability.  The evaluation is

carried out by the ALJ.  The claimant has the burden of proof on the first four steps.  *Parra v.

Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ

determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R.

§§ 404.1520(b) and 416.920(b).  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746.  The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

**STANDARD OF REVIEW**

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

The ALJ identified Richardson's date last insured as September 30, 2012, and noted he had not engaged in substantial gainful activity since January 1, 2009. He thought Richardson had the following severe impairments: hypertension, obesity, venous insufficiency, mild to moderate bilateral hearing loss, alcohol abuse, depression, obstructive sleep apnea, coronary artery disease, degenerative disc disease of the lumbar spine, headaches, hammer toes, and sciatica. The ALJ found none of the impairments, either singly or in combination, met or medically equaled the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.

Despite these impairments, the ALJ concluded Richardson retains the following residual functional capacity ("RFC"): he can perform a range of light work, except he can only perform tasks that involve up to two hours of standing/walking, and up to six hours of sitting in an eight-hour workday; he must be permitted to sit or stand at will while remaining on task; he can occasionally climb stairs and ramps, but must avoid climbing ladders, ropes, or scaffolds; he can occasionally balance, stoop, kneel, crouch, and crawl; he can tolerate occasional public contact, but no direct contact and no telephone work due to partial hearing loss and possible symptoms of

PTSD; he must avoid workplace hazards, such as unprotected heights or dangerous machinery; he can understand, remember, and carry out no more than simple instructions that can be learned within 30 days; he is limited to low stress jobs involving no more than occasional changes in work setting and no production line or assembly line type work; he is limited to goal-directed work.

Given this RFC, the VE testified Richardson can no longer perform his past relevant work. However, he can perform other jobs in the national economy, including electrical accessories assembler, inspector/handpackager, and electronics worker.

## FACTS

Richardson, 44 years old on the date of his alleged onset of disability, has a GED, two years of college credit, and three years of service in the U.S. Army. He was self-employed for years as a locksmith, until he went bankrupt in 2008.

Richardson received his medical care through the Veterans Health Administration. The earliest medical records begin in February 2011, when he had a normal cervical spine x-ray and a negative chest x-ray. A March 2011 lumbosacral x-ray revealed a curvature to the right in the upper lumbar area, mild to moderate disc space at L2-3 and L3-4, and facet sclerosis and narrowing bilaterally at L5-S1.

Later that month, Richardson went to the emergency department with a headache. He had been drinking regularly–reporting that he drank rum in an attempt to relieve his migraine–but he was ambulatory with a steady gait. Tr. 354. He presented as alert, overweight, disheveled, and in moderate distress. He had a depressed mood, was anxious, with poor eye contact, but he was not suicidal. Tr. 349. A head CT was normal on the whole, although a small abnormality was

noted that could have been related to a microvascular injury versus migraine headaches versus

hypertension. The following day, he reported waking up shaking uncontrollably with chills and

was concerned. He reported usually drinking for pain relief, but that he had stopped.

Richardson began alcohol rehabilitation in April 2011. At an appointment in late April,

he weighed 307 pounds and reported feeling no pain. Leslie Walker, M.D., urged Richardson to

stop using alcohol for pain relief or using it to bring his blood pressure down. Richardson

informed Dr. Walker that he was caring for his mother, who was in hospice with a rapidly

progressing brain tumor. His prescriptions included medications for heart failure, topical cream

for his toenails, a diuretic, nasal allergies, and vitamin supplements.

A month later, Richardson complained of low back and neck pain, as well as a headache,

and put his pain at a 7 of 10. He denied side effects from medications. He was given options of

NSAIDs, muscle relaxants, and low-dose opioids to treat his pain. He reported increased stress

in caring for his dying mother, but that his pain was controlled (at 5 out of 10) with Norco and

Etodolac. Tr. 321-22. By August 2011, Richardson reported his headaches had almost resolved,

and he put his pain at 5 out of 10, although he still felt he had a poor ability to perform his daily

activities. Nevertheless, he reported achieving his functional goals of walking, cooking,

attending church, and reading. Tr. 314. He had no difficulty walking or getting up and down

from a chair.

The next month, Richardson put his pain level at 7 out of 10, and reported being unable to

do much due to his pain. Richardson appeared in mild distress from pain. Tr. 309. He was

instructed to start light exercises and stretching to help with pain and weight loss.

In November, Richardson stopped taking all his pain medications because he thought some might be making his pain worse; he complained of a stiff back, and put his pain at 10 out of 10. He weighed 325 pounds. After discussing weight loss options with the doctor, Richardson reported being in a self-directed weight loss program which involved walking and caring for his father. Tr. 306. Dr. Walker encouraged selectively eliminating medications, and directed resumption of tramadol and an NSAID. Dr. Walker ordered a hip x-ray, which was normal, and a lumbar x-ray, which revealed the condition of Richardson's lumbar spine continued to be stable. Dr. Walker diagnosed him with degenerative disc disease L2-L3, and osteoarthritis with hypertrophic spurring anteriorly at L2-L3 and L3-L4.

In December, Richardson indicated he was having difficulty walking and he was given forearm crutches, but he noted "slight" improvement in early January 2012. He put his pain at 5 out of 10. Later that month, Richardson reported difficulties with pain medication side effects (racing heart beat and strange feelings), so he was taking only the Etodolac which he thought helped a little. He rated his pain at 8 out 10. He used a cane. Richardson was given a trial of Percocet. He was doing better in March, reporting an improvement in sleep and pain with Percocet. He put his pain at 5 out of 10. He felt he had improved in his ability to walk, cook, and attend church. He required no assistance to walk, and had no difficulty getting up and down from a chair. He was encouraged to stretch.

Richardson reported to the emergency room in July 2012 complaining of chest pressure; test results were normal. In August, Richardson's weight appeared to be stable at 316 pounds. He had tried hiking the day before, which caused his hips and low back to hurt. His pain was 8 out of 10. He requested completion of an Oregon Disabilities Hunting and Fishing Permit.

Page 8 - OPINION AND ORDER

Several weeks later, he sought care in the emergency department reporting pain in his lower left abdomen that left him doubled over.  He stated he had been wrestling with his child the previous night, and while he felt no discomfort at the time he wondered if he had a hernia.

In November 2012, Richardson weighed 304 pounds and he put his pain at a level 8.  He was encouraged to watch his caloric intake and get more exercise.  He reported his exercise program was "Self Directed; Walking, hunting[.]"  Tr. 437.  Dr. Walker renewed his prescription for oxycodone, and evaluated his hearing loss and tinnitus.  He was fitted with hearing aids.

Richardson underwent a PTSD orientation class in April 2013, and was scheduled for a mental health assessment.  Richardson met with Michael McNamara, a psychiatric/mental health nurse practitioner in July.  Richardson reported "irritability, anxiety, difficulty tolerating crowds, 'depression from pain', poor sleep, social isolation, generalized anger at 'stupid people', intrusive memories of a traumas seen as a firefighter and policeman."  Tr. 497.  He said he was unemployed, but liked to spend his time growing bonsai trees and riding his motorcycle.  Tr. 498.  McNamara found Richardson to be alert and attentive, cooperative and reasonable, with appropriate grooming.  His speech and thought content were normal, but his mood was anxious and dysphoric.  Richardson's memory was intact, his judgment and insight were good, and his fund of knowledge was above average.  McNamara thought it "as likely as not" that Richardson suffered from symptoms of PTSD.  Tr. 501.  Richardson asked for conservative treatment, mostly to help him sleep.  McNamara assigned a Global Assessment of Functioning score of 45.[1]

---

[1]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning.  A GAF of 41 to 50 means "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a

(continued...)

When Richardson returned to McNamara in August, Richardson placed his mood at 5 out of 10 (with 10 being the best) and that he did not feel hopeless.  Richardson was taking sertraline for mood and anxiety, and appeared brighter, used a little humor, and reported an improved mood with less anxiety.  He felt happy with his initial response to medication, although he was getting headaches that seemed to correspond with taking the medication, so McNamara prescribed Paxil and gabapentin.

Richardson requested an appointment in September, feeling that the Paxil was not working, despite being told it could take time.  When Richardson met with McNamara, he appeared agitated initially, but he calmed down over the course of the appointment.

At a September 2013 emergency department visit, Richardson complained of stabbing back pain that was unaffected by his oxycodone.  He was diagnosed with a lumbar back sprain and prednisone.

When Richardson returned to McNamara in October, he appeared calmer, with good activities of daily living.  He reported some difficulty concentrating, but he got mostly A's in college.  He was feeling less agitated and in better spirits.  At his primary care appointment, Arlene Bradley, M.D., urged back-specific exercises to help reduce pain.  Richardson said he had an eleven-year-old son whom he liked to play with and hike with, and Dr. Bradley encouraged

---

[1](...continued)
job)."  A GAF of 51 to 60 means "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)."  The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000) ("DSM-IV").  The most recent edition of the DSM eliminated the GAF scale.  *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2012).

Richardson to exercise with his son at least twice a day. She refilled Richardson's NSAID and his oxycodone, but encouraged him to use only what he needed.

## DISCUSSION

Richardson challenges the ALJ's credibility analysis and disputes the ALJ's rejection of McNamara's opinion or, alternatively, argues his condition called for a psychological evaluation.

I.    Richardson's Credibility

Richardson testified he could not do a simple job because he had a hard time focusing due to his pain. He reported feeling like he needed to lie down and put his feet up, and that he could not stand or sit for long periods of time. He testified he felt pain in his lower back, shoulder, and neck. He thought he could stand ten or 12 minutes, and could sit from five to 20 minutes depending on the chair. He felt numbness in his arms, hands and wrists, but had never sought treatment for it. He lived with his wife and eleven-year-old son, both of whom received social security disability. He testified he became disabled on January 1, 2009 due to pain, and also that his living situation changed when he went through a divorce and filed for bankruptcy. He explained that he had only recently sought treatment for depression and anxiety because he does not like doctors. He said the depression made him feel he has no will to live. On a typical day, he soaked in the hot tub, watched television, and paced; he made his own lunch, he went on short drives in the mountains to get out of the house, and took care of about 100 bonsai trees.

The ALJ opined that Richardson's "inability to work without some pain and discomfort . . . does not necessarily satisfy the test for disability under the provisions of the Act." Tr. 23. He felt that Richardson could manage his pain with medication to allow him to engage in light tasks requiring limited standing or walking.

Page 11 - OPINION AND ORDER

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. *Id.* The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. *Id.* "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006). Here, the ALJ concluded Richardson's testimony was not entirely credible for a number of reasons.

First, Richardson's activities included caring for his mother until she died in 2011. He also cared for his disabled son, gardened 100 bonsai trees, drove places for enjoyment, and attended church. In addition, he reported to one of his doctors that he had been hiking, and he sought a hunting and fishing permit. Richardson disputes the ALJ's reading of the record, noting that Richardson's mother passed away quickly, and that at one point he told his doctor he would be able to care for his mother if only he could reduce his pain. In addition, when he told his

doctor he had been hiking, it was to note the pain he felt afterward, and there is no evidence he went hunting or fishing.  Finally, he argues caring for bonsai trees is consistent with his physical limitations.

The ALJ's conclusion is supported by substantial evidence in the record.  In this case, Richardson's daily activities were inconsistent with his testimony purporting to be limited in his ability to sit, stand, walk, and concentrate.  *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).  Although on one occasion, he indicated his goal was to be free of pain in order to care for his mother, on several other occasions he reported actually serving as her care giver.  Tr. 326, 321.  Similarly, while Richardson reported pain after hiking, it did not stop him from inquiring about a hunting and fishing permit and he reported on several other occasions that his self-directed exercise plan consisted of walking, hunting and hiking.  Tr. 437, 537.  He testified at the hearing to driving in the mountains for enjoyment and told one provider he enjoyed riding his motorcycle.  Tr. 498.  Richardson's activities, which are inconsistent with his testimony, is a clear and convincing reason, and the ALJ's analysis is supported by substantial evidence in the record.

The ALJ also commented on the dearth of medical evidence supporting Richardson's testimony about pain in his shoulders, fingers, and hands, and Richardson's own testimony conceding he had not sought treatment.  A tendency to exaggerate symptoms is another valid reason to support a negative credibility finding.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).

The ALJ pointed out Richardson is described as "pleasant" and in no acute distress in his medical records, and Richardson did not report medication side effects.  Although the ALJ

cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). Richardson insists he reported side effects that the ALJ did not address. However, as often as Richardson reported side effects, his medications were adjusted. Further, he regularly denied medication side effects, as the Commissioner notes, citing Tr. 279, 300, 325, 327, 420, 431, 455, 548, and 559.

Finally, Richardson conceded he did not seek mental health treatment until after he filed for disability, explaining that he does not like doctors. While the ALJ must proceed cautiously in questioning a claimant's failure to seek psychiatric treatment for a mental condition, *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996), here Richardson repeatedly denied having any symptoms associated with depression and, further, when he began treatment his symptoms improved. Tr. 343 (not feeling hopeless in March 2011); Tr. 281 (psych appropriate, no suicidal ideation in January 2012); Tr. 465 (same in July 2012); Tr. 442 (same in August 2012); Tr. 495 (no suicide risk in July 2013); Tr. 509 (same in August 2013); Tr. 555 (same in September 2013); Tr. 542 (same in October 2013); Tr. 532 (not hopeless in November 2013); Tr. 501-11 (response to medication); Tr. 547-48 (calmer after medication adjustment). Richardson points to a time when a doctor described him as disheveled and anxious, but that was when he appeared in the emergency room for treatment of a headache that he tried to cure by drinking rum. Tr. 353. In short, the ALJ could rationally conclude that Richardson's dislike of doctors was not a persuasive explanation for his failure to seek mental health care earlier, and that it suggested his

mental symptoms were not as debilitating as he alleged, particularly given his regular access to doctors and medical treatment for his physical problems.

The Commissioner does not defend a few of the reasons given by the ALJ, such as Richardson's spotty work history, the reason for his decision to cease working, and his inconsistent statements about alcohol use, but she does not concede them.  Even assuming any of these reasons are not clear and convincing, a fact of which I am not convinced, some improper reasons does not mean the ALJ's entire credibility assessment is improper.  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004).  In sum, considering the ALJ's entire credibility assessment, the ALJ gave clear and convincing reasons, supported by substantial evidence in the record, to find Richardson capable of performing at a higher functional level than he reported.

II.    McNamara's Opinion

On December 1, 2013, after the ALJ issued her decision, McNamara completed and submitted a mental residual functional report.  He opined that ten percent of the day, Richardson would have difficulty remembering locations and work-like procedures, carrying out detailed instructions, performing activities within a schedule, asking simple questions, getting along with co-workers, maintaining socially appropriate behavior, and being aware of normal hazards.  For 15 percent of the day, McNamara thought Richardson would be unable to understand, remember and carry out even very short and simple instructions, maintain attention for extended periods, work in proximity to others, complete a normal workday, interact with the general public, accept instructions and criticism from supervisors, respond to changes in the work setting, travel to unfamiliar places, and set realistic goals.  The only tasks McNamara thought Richardson could

Page 15 - OPINION AND ORDER

perform most of the time was making simple work-related decisions and sustaining an ordinary routine without supervision.

Additional evidence presented to the Appeals Council but not seen by the ALJ may be considered in determining if the ALJ's denial of benefits is supported by substantial evidence. *Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000). The question is "whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence and was free of legal error." *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1232 (9th Cir. 2011) (citing *Ramirez v. Shalala*, 8 F.3d 1449, 1451-54 (9th Cir. 1993)).

Here, the ALJ pointed out McNamara is not considered an acceptable medical source. 20 C.F.R. §§ 404.1513(d), 416.913(d) (other sources may be considered when evaluating severity of impairments). As a result, his opinions are subject to rejection on the basis of reasons that are "germane" to that source. *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010). The ALJ pointed out that the GAF score of 45–which represents "serious symptoms"–seemed to be based on Richardson's reports of his symptoms and not supported by the objective evidence. For example, McNamara's own notes described Richardson as "brighter," with "a little humor and laugh[ing] appropriately." Tr. 25.

Considering substantial evidence supports the ALJ's conclusion that Richardson's mental health symptoms are not as debilitating as he represented, that McNamara's treatment notes do not support the GAF score he assigned, that McNamara relied on Richardson's reports and did not explain why he found Richardson as functionally limited as he did in his post-hearing report, I find McNamara's functional statement does not undermine the substantial evidence supporting the ALJ's decision.

Page 16 - OPINION AND ORDER

Alternatively, Richardson contends a consultative examination was required to establish the extent of Richardson's mental health impairment. A Social Security ALJ has an "independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Tonapetyan*, 242 F.3d at 1150 (internal quotation omitted). The ALJ must supplement the record if: (1) there is ambiguous evidence; (2) the ALJ finds that the record is inadequate; or (3) the ALJ relies on an expert's conclusion that the evidence is ambiguous. *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005). None of these circumstances exist. Richardson prevailed at step two, when the Commissioner relied on the opinion of the state agency consultant and found Richardson had a medically determinable mental impairment, but partially relied on McNamara's treatment records and other evidence of record to find the impairment severe. Tr. 124 (Megan D. Nicoloff, PsyD, opined the affective disorder was not severe); Tr. 25 (referencing state agency consultant's conclusion that Richardson's mental impairments are not severe).[2] McNamara's treatment of Richardson was sufficient to provide the ALJ with enough evidence to assess Richardson's functional limitations caused by his mental impairment.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.

---

[2] Thus, contrary to Richardson's suggestion, the ALJ did not rely on a nurse practitioner to establish the existence of a medically determinable impairment. In fact, the ALJ specifically rejected McNamara's diagnoses of PTSD and dysthymia as coming from a non-acceptable medical source. Tr. 20.

IT IS SO ORDERED.

DATED this ___6th___ day of May, 2016.

         /s/ Garr M. King_____
         Garr M. King
         United States District Judge